U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 MAR 29 PM 12: 50

CLERK
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

AUSTIN HANLEY, on behalf of )
HEATHER LEGER, deceased, )
    )
    Plaintiff, )
    )
    v. )    Case No. 2:17-cv-00013
    )
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security, )
    )
    Defendant. )

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR AN ORDER
REVERSING THE COMMISSIONER'S DECISION AND DENYING THE
COMMISSIONER'S MOTION TO AFFIRM**
(Docs. 10 & 11)

    Plaintiff Austin Hanley brings this action, on behalf of the deceased claimant,

Heather Leger, for Social Security Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") under the Social Security Act ("SSA"), seeking

reversal of the Social Security Commissioner's decision that Ms. Leger is not disabled.

On July 31, 2017, Plaintiff filed his motion to reverse (Doc. 10), and, on August 22,

2017, the Commissioner filed her motion to affirm (Doc. 11). Plaintiff replied on

September 21, 2017, at which point the court took the pending motions under

advisement.

    Plaintiff is represented by Arthur P. Anderson, Esq. The Commissioner is

represented by Special Assistant United States Attorney Andreea Lechleitner.

    Plaintiff raises the following issues: (1) whether Administrative Law Judge

("ALJ") Joshua Menard violated the treating physician rule; (2) whether the ALJ erred in

determining Ms. Leger's residual functional capacity ("RFC"); and (3) whether remand is

required for the ALJ to consider Ms. Leger's death certificate.

# I.    Procedural Background.

On May 12, 2015 and May 15, 2015, Ms. Leger filed applications for DIB benefits and SSI, respectively. In both applications, Ms. Leger alleged that she was disabled as of November 30, 2014. The Commissioner denied her applications initially on August 18, 2015 and on reconsideration on February 12, 2016. Thereafter, Ms. Leger filed a written request for a hearing on March 22, 2016. On July 26, 2016, she testified at a videoconference hearing before ALJ Menard.[1] Louis A. Laplante, a vocational expert ("VE"), also testified. On August 17, 2016, ALJ Menard issued a decision finding Ms. Leger was not disabled. The Appeals Council denied Plaintiff's request for review on December 1, 2016. As a result, ALJ Menard's decision stands as the Commissioner's final decision.

# II.    Factual Background.

When she passed away on September 11, 2016, Ms. Leger was a thirty-nine-year-old woman. At the time of her alleged disability onset date of November 30, 2014, she was thirty-seven years old. She is survived by an adult son, Austin Hanley, who proceeds as the plaintiff in this case on her behalf. Ms. Leger had a high school education and completed a cosmetology program. Her past work experience includes prep cook, pizza deliverer, waitress, machinist, and hairdresser.

## A.    Ms. Leger's Medical History.

Ms. Leger alleged disability from chronic liver disease, with symptoms of ascites[2] and edema, hepatitis, gastroesophageal reflux disease ("GERD"), depression, anxiety disorder, and post-traumatic stress disorder ("PTSD"). She also suffered from osteoarthritis of the hips, bilateral carpel tunnel syndrome ("CTS"), and symptoms of obsessive-compulsive disorder ("OCD"), attention deficit disorder ("ADD"), and

---

[1] At the hearing, Ms. Leger was represented by Meriam Hamada, a non-attorney representative from Attorney Anderson's firm.

[2] "Ascites" is an abdominal condition characterized by "[a]ccumulation of serous fluid in the peritoneal cavity." *Stedmans Medical Dictionary* (28th ed. 2006), *available at Westlaw* STEDMANS 78480.

attention deficit hyperactivity disorder ("ADHD"). Her medical records reveal a history of alcohol and marijuana use.

### 1. Ms. Leger's Psychological Traumas.

Ms. Leger described her childhood environment as "very chaotic." (AR 360.) She stated that her father drank and used illegal drugs throughout her youth and physically abused her, her mother, and her sister. As a fourteen-year-old sophomore in high school, she ran away from home to live with a twenty-five-year-old man whom she had befriended. This man abducted her for a period of seven months, during which he physically and sexually abused her. Ms. Leger was eventually able to escape from him and call the authorities, at which point the man was arrested, convicted, and imprisoned. Ms. Leger testified that her year-and-a-half relationship with the father of her son was also abusive. Her next serious relationship was a four-and-a-half year relationship with her ex-fiancé, who, in 2007, shot himself in front of her and died in her lap. She stated that "after the suicide[,] she took to drinking which led to an episode where her son was taken into his father's custody for a period of time." (AR 361.)

### 2. Ms. Leger's Treatment for Liver Disease.

On April 8, 2015, Ms. Leger was admitted to the University of Vermont Medical Center ("UVM-MC"), complaining of abdominal pain. Nellie Wirsing, M.D. noted that Ms. Leger had decompensated liver failure with cirrhosis and alcoholic hepatitis and performed an ultrasound, which showed moderate ascites. A physical exam revealed that Ms. Leger had normal gait, coordination, reflexes, motor strength, and range of motion in her joints. A mental status examination documented her mood and affect as normal and noted that she was pleasant, cooperative, and alert. Dr. Wirsing's prognosis was that Ms. Leger had less than one year to live and, on that basis, had an end-of-life discussion with her. According to subsequent medical reports, Ms. Leger was told that she had three months to live. *See, e.g.*, AR 703, 1312. On April 13, 2015, she left the emergency room against medical advice. "Upon leaving [UVM-MC,] [Ms. Leger] missed medication doses[,] got a new tatto[o][,] and became symptomatic again with increased ascites and abdominal pain." (AR 740.)

On April 15, 2015, Ms. Leger was admitted to Dartmouth-Hitchcock Medical Center and treated for her liver condition. Her symptoms improved over the course of her three-day stay, and she was discharged on April 18, 2015 with multiple prescriptions to manage her symptoms. She subsequently moved to Maine to live closer to her family.

On April 19, 2015, Ms. Leger was admitted to the emergency room at the Eastern Maine Medical Center ("EMMC"), stating that she was unable to get her liver medication prescriptions filled because she was unable to afford them. A physical exam revealed that she had normal range of motion, motor strength, and no neurological deficits. Ms. Leger was described as cooperative and fully oriented with appropriate mood and affect during her visit. She was given a single dose of her medications and advised to return on a weekday to see a social worker.

On May 3, 2015, Ms. Leger saw EEMC emergency room physician David R. Saquet, D.O. for her liver condition. He performed a physical examination and determined that she had normal gait, no neurological deficits, and was conscious, oriented, and alert. Dr. Saquet found that "there was nothing to be done for [Ms. Leger]" because there was no evidence of an ongoing infection, her white blood count had improved, and, after her pain was controlled with medication, she "was actually quite comfortable." (AR 650.) Ms. Leger declined hospital admission for intravenous fluids and pain control, preferring to return home and convalesce. On May 6, 2015, she returned to the hospital and was admitted to the emergency room for her end-stage liver disease, complaining of diffuse abdominal pain due to "medical noncompliance as she was not able to obtain several of her medications secondary to cost." (AR 680.) When Ms. Leger was discharged the next day, the discharge note reported that she was independent in her activities of daily living and that her cognition was unimpaired.

On May 12, 2015, Ms. Leger met with Joseph E. Harkins, M.D., a gastroenterologist, regarding her acute alcoholic hepatitis. She reported that she was doing better and avoiding alcohol. In Dr. Harkins's assessment, Ms. Leger's gait was "good" and she had "good get up and go." (AR 685.) During a follow-up appointment on July 14, 2015, she admitted that she had consumed alcohol on two occasions in the

4

last three months, but that she was "trying very hard to remain abstinent." (AR 802.) At this appointment, Dr. Harkins reviewed Ms. Leger's liver imaging, which failed to show cirrhosis. Her liver function tests demonstrated improvement in her condition. Dr. Harkins noted normal bowel sounds, no jaundice, and no asterixis.[3]

On November 6, 2015, Anthony R. Williams, M.D. from UVM-MC met with Ms. Leger regarding her liver condition and arthritis. Ms. Leger described her alcohol use as "2-3 times a week" during the appointment. (AR 1274) (internal quotation marks omitted). Dr. Williams found no signs or symptoms of worsening liver failure and noted that Ms. Leger was not on any medications for her liver condition or arthritis at the time of the appointment. Dr. Williams advised her to take ibuprofen to manage pain symptoms and recommended she follow a daily exercise regimen.

On January 20, 2016, Ovais Ahmed, M.D. from UVM-MC, evaluated Ms. Leger's liver disease. Dr. Ahmed noted that Ms. Leger "still continues to drink on occasion" and that her physicians "have stressed the importance of complete alcohol cessation." (AR 1178.) He recommended that she postpone all elective surgical procedures for her other impairments until she "remove[d] alcohol from her lifestyle." *Id.* On February 13, 2016, Nicholas Ferrentino, M.D., a gastroenterologist, provided a medical source statement, indicating that Ms. Leger did not have end-stage liver disease with a chronic liver disease score of twenty-two or greater pursuant to Listing 5.00D.1.

### 3. Treatment History with Amanda Grafstein, M.D.

After an initial meeting on November 24, 2015, Amanda Grafstein, M.D. became Ms. Leger's primary care physician. She identified Ms. Leger's impairments as cirrhosis of the liver, ascites, PTSD, arthritis, depression, and ADHD. On December 23, 2015, Dr. Grafstein conducted a physical examination, finding that Ms. Leger had a decreased range of motion bilaterally in the hips and abnormalities in the groin area and prescribed her a cane "as she states she uses a cane to walk secondary to pain and her cane is too

---

[3] "Asterixis" is defined as "[i]nvoluntary jerking movements, especially in the hands" and is synonymous with a "flapping tremor[.]" *Stedmans Medical Dictionary* (28th ed. 2006), *available at Westlaw* STEDMANS 80400.

short [and she] cannot afford a new one[.]" (AR 1333.) During a February 17, 2016 appointment, Ms. Leger admitted that she was "still drinking one glass of wine most weekends" and that she "uses alcohol as a means of relaxation" despite knowing "that she needs to abstain." (AR 1351.) She stated that she regularly attended Alcoholics Anonymous meetings with a relative. Describing her mental health treatment with Dr. Elizabeth Pierson and Louise George, LCSW, Ms. Leger stated it was "going well" and that she believed she was "on a good medication regimen." (AR 1352.)

Regarding her physical impairments, Ms. Leger described "significant bilateral wrist pain." (AR 1351.) She also reported bilateral hip pain, but stated that she did not want to pursue physical therapy because she had "too much on her plate[]" at the time. (AR 1352.) Dr. Grafstein's physical examination of Ms. Leger revealed no jaundice and normal muscle tone. A mental examination demonstrated that Ms. Leger had normal mood, affect, thought content, and behavior, although she presented as nervous and anxious.

In completing two forms exempting Ms. Leger from training or work requirements to receive Vermont General Assistance benefits, Dr. Grafstein checked a box indicating that Ms. Leger was unable to work at her usual occupation and could not "work in any other type of employment[.]" (AR 1137, 1200.) She did not provide an explanation as to why she reached these conclusions.

### 4. Ms. Leger's Testing for CTS.

In 2012 and 2016, Ms. Leger underwent electromyography testing ("EMG") to evaluate the severity of her CTS. The 2012 EMG demonstrated that she had "moderate to severe right and moderate to severe left [CTS]." (AR 1151.) A second EMG in April 2016 was still abnormal, but showed improvement, with mild to moderate right and mild left CTS. In 2016, both a Tinel's sign and Durkin's sign were positive bilaterally for CTS.

### 5. Mental Health Treatment History.

On November 24, 2015, Ms. Leger met with Elizabeth Pierson, M.D., a psychiatrist at UVM-MC, on referral from Dr. Williams. Dr. Pierson treated Ms. Leger

6

for anxiety, PTSD, ADHD, panic disorder, and depression. She also noted Ms. Leger's "alcohol use disorder[,]" describing it as "severe" and "sustained" but currently in remission due to continued sobriety. (AR 1308.)

During the initial appointment, Dr. Pierson found that Ms. Leger's "[t]hought processes are coherent and goal directed," although "she has some difficulty with dates and focus[.]" (AR 1284.) Dr. Pierson observed that Ms. Leger's "memory, concentration and attention [are] grossly intact." *Id.*; *see also* AR 1307, 1365 (noting Ms. Leger's memory was "grossly intact"). Dr. Pierson described Ms. Leger as "cooperative" with "good eye contact" though "intermittently tearful[,]" and, notwithstanding her congruent affect, Ms. Leger's mood was "dysphoric" and anxious. (AR 1284.) She reported constant restlessness related to her ADHD, such that she tried "to watch movies for distraction, but has a difficult time attending [to them]." (AR 1286.) Dr. Pierson prescribed Adderall for ADHD, Lorazepam for panic symptoms, Prazosin for PTSD-related nightmares, and Effexor XR and Lamictal for depression.

After starting Adderall, Ms. Leger reported that she felt calmer, "less fidgety, . . . less anxious[,]" and capable of finishing a movie without having to review it several times to understand it. (AR 1319.) When she began experiencing fewer benefits from Adderall, Dr. Pierson increased the dosage, resulting in a "very good response" in treating Ms. Leger's ADHD symptoms. (AR 1323.) Dr. Pierson also noted that the Prazosin reduced Ms. Leger's PTSD-induced nightmares. Nevertheless, Ms. Leger's panic symptoms persisted "daily" and worsened if she needed to leave her home. (AR 1305.) During Ms. Leger's April 11, 2016 appointment, Dr. Pierson observed that Ms. Leger had "started to feel more depressed[]" in the two weeks prior to the appointment. (AR 1363.)

On July 12, 2016, Dr. Pierson completed a medical source statement. She opined that Ms. Leger suffered from depression, anxiety, and affective disorder as well as recurrent severe panic attacks and recurrent intrusive recollections of traumatic experience. Dr. Pierson opined that Ms. Leger had "marked" difficulties maintaining social functioning and concentration, persistence, or pace, as well as "extreme"

restrictions in her activities of daily living. (AR 1370.) She reported that Ms. Leger experienced four or more episodes of decompensation. In finding that Ms. Leger had difficulty responding appropriately to criticism from supervisors and experienced conflicts with coworkers, Dr. Pierson explained that Ms. Leger would respond with "avoidance, [increased] panic, [and] agoraphobia." (AR 1371.) She expected Ms. Leger would have incidents responding inappropriately to coworkers and supervisors five times a week, "perhaps daily[.]" *Id.* Workplace quality control standards, production quotas, and deadlines would increase her anxiety.

Dr. Pierson opined that Ms. Leger would have "perhaps daily" absences from work due to her impairments. (AR 1372.) "[She] believe[d] [Ms. Leger] is fully impaired/disabled outside of her home environment, attending appointments, [and] basic [activities of daily living]." (AR 1373.)

## B. State Agency Consultants' Assessments.

### 1. Physical Health Assessments.

At the request of Vermont Disability Determination Services, Alan D. Lilly, M.D. examined Ms. Leger and provided a physical evaluation on January 26, 2016. In evaluating Ms. Leger's extremities, he found the following:

In the upper extremities, which appear normal with good circulation, there is a brace to the right wrist. She states that she does have some pain and sensory changes in the thumb, index, and long finger of the right hand, but she is able to use the hand quite normally. As to the hands, . . . she states that she does have some mild arthritis. As stated, both hands move well with no evidence of a carpal tunnel problem in the left wrist at this time. The lower extremities reveal some soreness generally in her legs, knees, and thighs but again full range of motion. No real swelling. The lower extremities are equal and symmetrical without deformity, [and with] good circulation.

(AR 1182.) Dr. Lilly noted that Ms. Leger could make a fist with both hands, extend her fingers, and oppose her thumbs.

Assessing Ms. Leger's other limitations, he reported:

She moves reasonably well. She is able to stand with difficulty using her cane. She is able to walk slowly and carefully, but she is able to walk and

8

has good balance without tremor. The cranial nerves are intact. Motor wise, there may be some generalized muscle weakness due to her condition necessitating the use of a cane, but she is able to stand and move about without evidence of atrophy or tremor. Sensation is only abnormal in the distribution of the median nerve to the right hand, [involving] some minor sensory changes. Deep tendon reflexes are reduced at the biceps. Patella and Achilles absent bilaterally. . . . Motor examination in upper extremities – She moves well with good strength in the upper extremities. Lower extremities – There may be some mild weakness in her lower extremities due to some back and hip pain, but once she is able to stand and use her cane she is able to move reasonably well.

(AR 1182-83.)

Other than mildly diminished sensation in her right hand, sensation was normal throughout Ms. Leger's body. Despite finding Ms. Leger had "some generalized muscle weakness" (AR 1183), Dr. Lilly observed that she was "able to stand with difficulty utilizing her cane[]" and could walk "slowly and carefully[.]" (AR 1182.) While she could flex and extend, her range of motion was restricted "to about 50% due to some low back weakness" and pain. (AR 1183.)

On February 12, 2016, Geoffrey Knisely, M.D. assessed Ms. Leger's physical RFC on reconsideration of Plaintiff's DIB claim. He determined that Ms. Leger could occasionally lift twenty pounds and frequently lift ten pounds. He concluded that, over the course of an eight-hour workday, she could sit or stand for approximately six hours and that she had no manipulative or postural limitations.

## 2. Mental Health Assessments.

On March 19, 2013, State agency consultant Benjamin Skolnik, Psy.D. assessed Ms. Leger's mental health. He found her "friendly, engaged, and cooperative throughout the interview and [that] there was nothing notably unusual about her posture, gait, or motor behavior." (AR 359.) After reviewing Ms. Leger's mental health history, he concluded that Ms. Leger had an adjustment disorder with anxiety and depressed mood, PTSD, and a generalized anxiety disorder. Dr. Skolnik administered the Mini-Mental State Exam ("MMSE") in which Ms. Leger received a score of twenty-nine out of thirty. Based on this result, Dr. Skolnik stated that there was no indication that Ms. Leger had

9

"any significant difficulties with attention, concentration, immediate, or short term memory." (AR 362.) However, in light of the physical abuse and trauma she had experienced, Dr. Skolnik opined:

> [Ms. Leger] has been through an unspeakably horrific series of events beginning in childhood and extending into the present day. . . . Given [the multitude of abusive and traumatic relationships and a life threatening medical condition], she appears to manifest a significant amount of resilience which has enabled her for most of her life to carry on employment without significant impairment. At the present time her physical limitations as well as the extreme stress of her recent relational and medical traumas have made it difficult for her to continue to function in the way that she used to. I think her resilience has a limit and that she appears to have come close to reaching hers.

(AR 362-63.)

On July 22, 2015, State agency psychologist John Hale, Ed. D. interviewed Ms. Leger to conduct a mental health assessment. Dr. Hale noted that Ms. Leger "reports liking people and is extroverted and tends to seek people out but more in the past. There are times now [when] she typically tends to isolate [herself]. She has always been comfortable socially and has never felt awkward and has felt as if she has fit in." (AR 853.) He further found her to be "engaging and sociable but often intense" and observed that she "was focused and displayed positive concentration" during the examination. (AR 855.) In providing his medical source statement, Dr. Hale opined that:

> Notwithstanding her physical limitations and extreme vulnerability physically, she seems to have the ability to follow work-related rules and authority. She also again, notwithstanding the chronicity of her liver damage, likely could be dependable and reliable. Her coping skills at this time appear to be somewhat limited. She is overwhelmed affectively and is experiencing ongoing flashbacks and reliving of memories related to her trauma history. She likely would have difficulties interacting in a comfortable and effective manner with others in a work environment. Again, due to what seemed to be valid physical problems she likely would have problems with concentration, adaptability, and being able to persist at a reasonable rate in a work environment. Certainly, [this] examiner needs to defer to a physician to further assess her physical condition and prognosis.

(AR 856.)

On November 30, 2015, Pamela Nash, Psy.D. interviewed Ms. Leger and completed a consultative psychological diagnostic report at the request of Vermont Disability Determination Services. She concluded that diagnoses of PTSD, depressive disorder, panic disorder, and generalized anxiety disorder for Ms. Leger were indicated. During the mental status examination, Dr. Nash noticed that Ms. Leger "appeared to be in visible pain as evidenced by [her] needing to shift her position several times and grimacing as she did this[]" and that she "kept rubbing her wrists and elbows as if they were causing her discomfort without realizing she was doing it." (AR 1097.) Dr. Nash further observed that:

> [Ms. Leger] was tearful on and off throughout the evaluation and at two points began to exhibit panic symptoms. Her breathing increased and we had to take a few minutes to help her calm down. She was visibly trembling as well. She did appear to have some trouble concentrating and appeared to be exhausted after each detailed question she was asked.

*Id.*

Despite these concerns, Dr. Nash found Ms. Leger cooperative and fully oriented throughout the examination and assigned her a score of thirty out of thirty on the MMSE, indicating no deficits in concentration, memory, and attention.

On July 27, 2015, Leigh Haskell, Ph.D. completed a mental RFC assessment. Dr. Haskell found Ms. Leger mildly restricted in activities of daily living, but that she had "[m]arked" difficulties in maintaining social functioning, concentration, persistence, or pace. (AR 99.) She additionally opined that the medical evidence in the record supported a finding that Ms. Leger's depressive and anxiety disorders met Listing 12.06.

On August 11, 2015, Joseph Patalano, Ph.D. provided a mental RFC assessment, finding that Ms. Leger had "[m]ild" restrictions in activities of daily living and difficulties maintaining social functioning. (AR 121.) He also found her "[m]oderate[ly]" restricted in maintaining concentration, persistence, or pace. *Id.* In explaining these limitations, Dr. Patalano determined that Ms. Leger may have episodic limitations in persistence and pace from an occasional health and environmental standpoint, but she could nonetheless retain the capacity to sustain concentration,

11

persistence, or pace for two-hour periods over an eight-hour day. He further stated that she was capable of getting along with others and could follow simple instructions.

On December 14, 2015, Howard Goldberg, Ph.D. completed a mental RFC assessment and opined that Ms. Leger had "[m]oderate" difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace and "[m]ild" restrictions in activities of daily living. (AR 159.) He concluded that she would be "[l]imited for complex tasks and high production norm tasks[]" and "[e]pisodic exacerbations in psychiatric symptoms [would] temporarily undermine [her] cognitive efficiency[,]" but that she could sustain concentration, persistence, or pace for two-hour periods for "simple 1-3 step tasks in [a] low production norm setting, with social and adaptive limitations." (AR 162.) He further opined that Ms. Leger would be "restricted from intense and/or frequent social interaction with the public, co-workers, and supervisors." *Id.*

### C. Ms. Leger's Function Reports.

In 2015, Ms. Leger completed three Function Reports describing how her physical and mental condition impacted her activities of daily living. In all three Function Reports, she stated that constant pain affects her ability to perform personal care tasks and described her difficulties with getting dressed, taking a shower, and using stairs. In the May 24, 2015 Report, she stated that she can prepare simple meals, however, both the October 15, 2015 and December 8, 2015 Reports stated that her son cooked meals for her. In the May 2015 Report, Ms. Leger stated that she could drive, whereas in the latter two Reports she indicated that driving was no longer possible. In terms of her capacity to perform house and yard work, Ms. Leger stated that while she can clean and wash dishes, she "[could not] do much else[.]" (AR 320.) When describing her limitations walking, she related that she could walk to the mailbox and back to her house, a distance of approximately 110 feet, before needing to stop and rest. She reported that she was capable of buying groceries while using her cane, but needed "help carrying heavy bags[.]" (AR 286.) In completing the October 15, 2015 Function Report, Ms. Leger related that her "hands always get cramped and stuck[,]" that she "always drop[s] things,"

and that "writing this [Function Report] is cramping [her] fingers [and] forearm."
(AR 310.)

Regarding her ability to work with supervisors and coworkers, Ms. Leger stated
that she "never had a proble[m]" (AR 324) and got along "fine" with authority figures
(AR 316), maintaining that she never lost a job because of disputes with supervisors or
co-workers. However, when asked if she had any problems getting along with others, she
responded that "[s]ometimes[] [she] get[s] frustrated eas[ily]" and, in such situations, she
"just stay[s] to [her]self." (AR 315.) While she described herself as capable of following
written instructions if she did not get distracted, she also admitted to having "a hard time
remembering" spoken instructions. (AR 288.) Ms. Leger further stated that she cannot
"handle stress at all" in that she "shut[s] down[] with anxiety[] [and] depression[.]"
(AR 316.) When experiencing stress, she related that she "goes into a panic attack[,]
hide[s] in her room[,] [and] cries[.]" (AR 324.)

## D.     Ms. Leger's Testimony at the July 26, 2016 Hearing Before ALJ Menard.

At the July 26, 2016 hearing before ALJ Menard, Ms. Leger testified that she
stopped working in 2014 due to her CTS, which prevented her from completing
necessary tasks for working at a restaurant, including picking up bowls and putting pans
into an oven. She stated that she can no longer "pour a gallon of milk one-handed or
carry stuff in from the car," such as groceries. (AR 59.) She also cannot take out the
trash or walk her dog. When ALJ Menard asked about her second EMG in 2016, which
showed improvement in her CTS, Ms. Leger stated that she did not understand the result
because she felt "two times worse than" when the previous EMG was performed in 2012.
(AR 60.) She further explained that her physicians delayed surgery for her CTS because
they "wanted to make sure that [her] liver was good enough to be able to handle a
surgery." (AR 61.)

Regarding her liver condition, Ms. Leger reported that she was recently
hospitalized due to low potassium levels. Although doctors gave her three months to live
over a year ago, she described her condition as "stable[,]" stating that it was "not getting

13

worse but [it is] not getting that much better, either." (AR 62.) Ms. Leger averred that she had stopped drinking alcohol.

Ms. Leger explained that arthritis in her hips, which began bothering her in 2015, did not derive from a specific injury, but rather her hips "just started aching" around that time. (AR 63.) She added that she treated the pain caused by her hips with over-the-counter ibuprofen. After she was prescribed a cane, she used it at all times inside and outside of her home. At the time of the hearing, Ms. Leger had not yet discussed with a rheumatologist whether hip surgery would be appropriate.

In describing her mental health, including her PTSD, depression, anxiety, OCD, and ADHD, Ms. Leger testified that the medications prescribed by Dr. Pierson were "definitely helping[]" her symptoms (AR 68) and noted that, although she had been suffering from PTSD since she was approximately fourteen years old, witnessing the suicide of her ex-fiancé in 2007 exacerbated her symptoms. Regarding her other mental health conditions, she agreed with ALJ Menard that she had been experiencing these conditions for "quite a while" before her alleged onset date in 2014. (AR 67.)

With regard to her physical RFC, Ms. Leger stated that she had difficulty standing for more than five minutes at a time due to her hips. She described her fear of walking "because [her] hip goes out[,]" causing a "piercing" or "stabbing" pain. (AR 69.) When using stairs, she stated that she could only climb three to four stairs while using the railing and her cane before stopping. She further stated that sitting for more than ten minutes was uncomfortable. In terms of lifting or carrying, Ms. Leger related that she could no longer carry groceries due to her hips and CTS. As of March 2015, she was unable to drive a car due to the pain in her hips, neck, and hands, testifying that she "literally pick[ed] up [her] leg to get in and out of the car[]" which "makes it really hard for [her] to drive." (AR 47.)

Regarding her mental RFC, she admitted difficulties with concentration, stating that she encountered challenges in watching a movie or reading a book. While she testified that she was capable of attending church, taking care of her personal needs, and playing on her computer, Ms. Leger stated that her son took care of the household chores.

14

## III.  ALJ Menard's August 17, 2016 Decision.

In order to receive disability benefits under the SSA, a claimant must be disabled on or before the claimant's date last insured. A five-step, sequential-evaluation process determines whether a claimant is disabled:

(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

On August 17, 2016, ALJ Menard denied Ms. Leger's application for benefits, finding she was not disabled. In so ruling, he determined that she had not engaged in substantial gainful activity since November 30, 2014. At Step Two, he found the following severe medically determinable impairments: "chronic liver disease, hepatitis, osteoarthritis of the hips, major depressive disorder, anxiety disorder/posttraumatic stress disorder, panic disorder, and an alcohol use disorder in current remission[.]" (AR 19.)

Notwithstanding the medical evidence in the record which established that Ms. Leger also "suffer[ed] from gastroesophageal reflux disease ('GERD'), endometriosis, carpel tunnel syndrome in her hands and symptoms of obsessive-compulsive disorder and attention deficit disorder/ADHD," ALJ Menard found these impairments were non-severe

because "there is no substantial medical evidence in the record establishing the claimant has significant work-related limitations" arising from them. (AR 20) (emphasis omitted). At Step Three, he concluded that none of Ms. Leger's severe impairments, either independently or collectively, met or exceeded the severity of one of the Listings.

At Step Four, ALJ Menard determined that Ms. Leger had the RFC to "perform light work as defined in 20 CFR [§§] 404.1567(b) and 416.967(b) except that she is limited to performing simple routine tasks. She can have frequent interaction with supervisors, but only occasional interaction with coworkers and the general public." (AR 24.) He found that "[t]he medical evidence of record does not support the claimant's allegations [that] she would be incapable of performing a light range of exertion level work." (AR 25.)

At Step Five, ALJ Menard concluded that while Ms. Leger is unable to perform any past relevant work, she could perform a significant number of jobs in the national economy such as "marker[,]" "mail clerk[,]" and "laundry sorter[.]" (AR 33.) For these reasons, ALJ Menard found Ms. Leger was not disabled from November 30, 2014 to August 17, 2016, the date of his decision.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre*, 758 F.3d at 149. "It is the function of the Secretary, not [the reviewing courts], to resolve

16

evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."
*Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir.
1984) (internal quotation marks omitted) (alteration in original).

## B. Whether ALJ Menard Violated the Treating Physician Rule.

Plaintiff argues that the ALJ erred in assigning "little weight" to the opinions of
Ms. Leger's treating psychiatrist, Dr. Pierson, and her primary care physician, Dr.
Grafstein. (AR 31, 32.) "[T]he SSA recognizes a treating physician rule of deference to
the views of the physician who has engaged in the primary treatment of the claimant[.]"
*Burgess*, 537 F.3d at 128 (internal quotation marks omitted).

> Treating source means [the claimant's] own acceptable medical source who
> provides [the claimant], or has provided [the claimant], with medical
> treatment or evaluation and who has, or has had, an ongoing treatment
> relationship with [the claimant]. Generally, we will consider that [the
> claimant has] an ongoing treatment relationship with an acceptable medical
> source when the medical evidence establishes that [the claimant] see[s], or
> [has] seen, the source with a frequency consistent with accepted medical
> practice for the type of treatment and/or evaluation required for [the
> claimant's] medical condition(s).

20 C.F.R. § 404.1527(a)(2). Treating physicians "are likely . . . most able to provide a
detailed, longitudinal picture of [a claimant's] medical impairment(s)" and they "may
bring a unique perspective to the medical evidence that cannot be obtained from the
objective medical findings alone or from reports of individual examinations, such as
consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).

"[T]he opinion of a claimant's treating physician as to the nature and severity of
the impairment is given 'controlling weight' so long as it 'is well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the
other substantial evidence in [the] record.'" *Burgess*, 537 F.3d at 128 (alteration in
original) (quoting 20 C.F.R. § 404.1527(c)(2)). If an ALJ does not accord a treating
physician's opinion "controlling weight," he or she is required to give "good reasons" for
the lesser weight assigned. 20 C.F.R. § 404.1527(c)(2); *Burgess*, 537 F.3d at 129. "The
requirement of reason-giving exists, in part, to let claimants understand the disposition of

their cases, even—and perhaps especially—when those dispositions are unfavorable." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). "[F]ailure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (internal quotation marks omitted).

If a medical opinion from a treating physician is given less than controlling weight, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the "relevant evidence" provided in support of the opinion, "particularly medical signs and laboratory findings"; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is giving an opinion "about medical issues related to his or her area of specialty"; and (6) any other relevant factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)-(6) (explaining that "[u]nless we give a treating source's medical opinion controlling weight . . . , we consider all of the following factors in deciding the weight we give to any medical opinion").

### 1. Whether ALJ Menard Properly Assigned "Little Weight" to Dr. Pierson's Opinions.

Plaintiff argues that ALJ Menard violated the treating physician rule in assigning Dr. Pierson's opinions less than controlling weight, reasoning that the ALJ selectively cited to Ms. Leger's Function Reports and the findings of consultative examiners in evaluating Dr. Pierson's opinions. An ALJ may consider the relevant evidence provided in support of the physician's opinion as well as the consistency of that opinion with the physician's own treatment notes and other evidence in the record. *See* 20 C.F.R. § 404.1527(c)(3)-(4). In her medical source statement, Dr. Pierson opined that Ms. Leger had marked difficulties in maintaining social functioning and concentration, persistence, or pace and extreme restrictions in activities of daily living due to her mental impairments. She also indicated Ms. Leger could not "focus and concentrate on job tasks for 2[-]hour periods of time during an 8-hour workday[.]" (AR 1371.) Although Dr. Pierson is a treating source with a specialty in psychiatry, ALJ Menard found her opinions on Ms. Leger's mental RFC inconsistent with other evidence in the record. For

18

example, he found Dr. Pierson's conclusion that Ms. Leger would have difficulty responding appropriately to criticism from supervisors and to conflicts with coworkers inconsistent with Ms. Leger's own assessment that she had "never had a proble[m]" and got along "fine" with authority figures and that she had never lost a job because of problems getting along with others. (AR 324, 316.) There is no error in the ALJ's determinations with regard to this aspect of Dr. Pierson's opinions.

However, in assigning "little weight" to Dr. Pierson's opinion that Ms. Leger had marked restrictions in social functioning and in maintaining concentration, persistence, or pace, ALJ Menard did not fully address the challenges Ms. Leger would face in a competitive work environment and the ample evidence that she would have them. SSR 85-15 recognizes that:

Individuals with mental disorders often adopt a highly restricted and/or inflexible lifestyle within which they appear to function well. . . . The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day.

SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985).

In addition to Dr. Pierson, Drs. Hale, Nash, Patalano, and Goldberg all noted Ms. Leger would experience significant difficulties in a competitive work environment with Dr. Haskell finding Ms. Leger's medical conditions met Listing 12.06 for depressive and anxiety disorders. An ALJ's "failure to explain why no stress limitation were included in the RFC was an error that requires remand." *Ross v. Astrue*, 2013 WL 935786, at *7 (N.D.N.Y. Feb. 11, 2013), *report and recommendation adopted*, 2013 WL 935771 (N.D.N.Y. Mar. 11, 2013); *see also Stadler v. Barnhart*, 464 F. Supp. 2d 183, 188-89 (W.D.N.Y. 2006) ("Because stress is 'highly individualized,' mentally impaired individuals 'may have difficulty meeting the requirements of even so-called 'low-stress jobs,' and the Commissioner must therefore make specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work.") (quoting SSR 85-15). Because the ALJ did not provide "good reasons" for

19

failing to assign controlling weight Dr. Pierson's opinion that Ms. Leger had marked restrictions in social functioning and in maintaining concentration, persistence, or pace, remand is required. *Selian*, 708 F.3d at 419; *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (remanding "to allow the ALJ to reweigh the evidence" and "develop[] the record as may be needed" because the ALJ "failed to provide plaintiff with 'good reasons' for the lack of weight attributed to her treating physician's opinion").[4]

In contrast, ALJ Menard properly found that Dr. Pierson's conclusion that Ms. Leger's activities of daily living were extremely restricted by her mental impairments was inconsistent with substantial evidence in the record. In her Function Reports, Ms. Leger acknowledged she could perform personal care tasks, shop, pay bills, or handle her own finances. She attributed difficulties in other activities of daily living to her physical conditions. Drs. Patalano and Goldberg both found that Ms. Leger had only mild mental health limitations affecting her activities of daily living. There was no error in ALJ Menard reaching a similar conclusion.

Finally, ALJ Menard erred in failing to accord controlling weight to Dr. Pierson's opinion regarding Ms. Leger's absenteeism. Despite Dr. Pierson's finding that Ms. Leger experienced four or more episodes of decompensation, each of extended duration, and her conclusion that Ms. Leger would be absent from work "perhaps daily" due to her mental health (AR 1372), ALJ Menard's RFC determination did not reflect any limitations arising from absences from work. In support of ALJ Menard's conclusion, Dr. Patalano found that Plaintiff suffered no episodes of decompensation, but there is no explanation as to why ALJ Menard credited the opinion of a non-examining State agency consultant over the opinion of Plaintiff's treating physician. *See Hidalgo v. Bowen*, 822 F.2d 294, 297 (2d Cir. 1987) ("A corollary to the treating physician rule is that the opinion of a

---

[4] Plaintiff contends that ALJ Menard further erred by failing to address the conclusions of non-examining, State agency consultant Dr. Haskell, whose opinions were consistent with Dr. Pierson's opinion that Ms. Leger was markedly restricted in maintaining social functioning and concentration, persistence, or pace. Because remand is required in this case, the ALJ should consider Dr. Haskell's opinions in evaluating Dr. Pierson's opinions and in determining Ms. Leger's RFC.

non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis."). Any error was not harmless because there was substantial evidence in the record to support Dr. Pierson's opinion. Dr. Goldberg found Ms. Leger would experience "[e]pisodic exacerbations in psychiatric symptoms" which would "temporarily undermine [her] cognitive efficiency[,]" (AR 162), and Dr. Skolnik opined that "her resilience has a limit and that [Ms. Leger] appears to have come close to reaching hers." (AR 363.) Moreover, in light of her physical end-of-life prognosis, Ms. Leger could reasonably be expected to have excessive absenteeism related to medical appointments and hospitalizations.

By not addressing her expected absentee rate, ALJ Menard did not provide "good reasons" as to why Dr. Pierson's opinion regarding Ms. Leger's "perhaps daily" absences should not be given controlling weight. On remand, the ALJ must consider the impact of absenteeism on Ms. Leger's RFC. *See Kelly v. Astrue*, 2011 WL 817507, at *10 (N.D.N.Y. Jan. 18, 2011), *report and recommendation adopted, Kelly v. Comm'r of Soc. Sec.*, 2011 WL 807398 (N.D.N.Y. Mar. 2, 2011) (concluding that the ALJ erred by making "no attempt to reconcile this conflict[] [by] explain[ing] why the treating physician's assessment was not entitled to controlling weight, and/or to justify his decision to credit the conclusion of a non-examining review consultant[]" in assessing the plaintiff's RFC).

The court therefore REMANDS the case for an ALJ to explain why Dr. Pierson's opinions regarding workplace stress and absences should not be afforded controlling weight consistent with the treating physician rule. *See Burgess*, 537 F.3d at 129 ("Failure to provide such 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.") (internal quotation marks omitted).[5]

---

[5] Plaintiff also argues that ALJ Menard improperly found that Ms. Leger could frequently interact with supervisors but only occasionally interact with coworkers and the general public and erred by not asking the VE if the jobs he identified were considered "low production work." (Doc. 10-1 at 20) (internal quotation marks omitted). Because the ALJ's assessment of Plaintiff's mental RFC requires a remand, the court need not reach these issues. *See Greek v.*

21

## 2. Whether ALJ Menard Properly Assigned "Little Weight" to Dr. Grafstein's Opinions.

Plaintiff asserts that ALJ Menard failed to properly weigh the opinions of Dr. Grafstein, Ms. Leger's primary care physician, who completed two questionnaires relating to Ms. Leger's requests to be exempted from training or work requirements as a condition to her receipt of Vermont General Assistance benefits. Plaintiff maintains that the "only reason" the ALJ provided in affording Dr. Grafstein's opinion "little weight" is that her prognosis in the two reports regarding the amount of time Plaintiff had to live was inconsistent. (Doc. 10-1 at 21.)

In response to the questionnaires, Dr. Grafstein checked a box indicating that Ms. Leger was unable to work at her usual occupation and could not "work in any other type of employment[.]" (AR 1137, 1200.) By assigning "little weight" to these opinions, ALJ Menard did not err in noting that "determinations of disability" are reserved to the Commissioner, and conclusions as to whether a claimant can perform her past work, or other types of employment, are better reserved for the VE. (AR 32.) He also properly stated that because disability determinations from state agencies are "based on [their] own rules, [such decisions] are not binding on [the ALJ][.]" 20 C.F.R. §§ 404.1504, 416.904. Although medical opinions rendered for state agency disability determinations are "entitled to some weight and should be considered[,]" *Hankerson v. Harris*, 636 F.2d 893, 897 (2d Cir.1980) (internal quotation marks omitted), checklist findings without explanation "are of limited evidentiary value." *Slattery v. Colvin*, 111 F. Supp. 3d 360, 373 (W.D.N.Y. June 29, 2015). Here, Dr. Grafstein did not support her conclusions with an explanation as to how she reached them. Thus, ALJ Menard provided "good reasons" for assigning Dr. Grafstein's opinions "little weight."

## C. Whether ALJ Menard Erred in Determining Ms. Leger's RFC.

In evaluating Ms. Leger's RFC, ALJ Menard concluded she could perform light work, "except she is limited to performing simple routine tasks." (AR 24.) Because ALJ

---

*Colvin*, 802 F.3d 370, 372 n.1 (2d Cir. 2015) (declining to reach additional issues where the ALJ erred in giving little weight to a treating physician, requiring remand).

Menard violated the treating physician rule in weighing the opinions of her treating psychiatrist, Dr. Pierson, his RFC determination must be remanded. *See Mortise v. Astrue*, 713 F. Supp. 2d 111, 127 (N.D.N.Y. 2010) (finding the ALJ's RFC analysis "necessarily flawed" because the court found the ALJ erred in applying the treating physician rule).[6] In doing so, the ALJ should address any limitations due to Ms. Leger's need to use a cane.[7]

### D. Whether Errors in Determining Ms. Leger's RFC are Harmless.

The Commissioner argues that Ms. Leger elected not to pursue physical therapy for her hip pain because she had "too much on her plate" (AR 1352), and that the failure

---

[6] While Plaintiff contends that ALJ Menard erred by not including limitations arising from her CTS in her RFC, substantial evidence supports the ALJ's determination in this respect, as Ms. Leger's most recent, April 2016 EMG, revealed moderate right and mild left CTS, and Dr. Lilly's 2016 examination demonstrated that she could move both hands well, use her right hand "quite normally[,]" and that there was "no evidence" of CTS in her left wrist. (AR 1182.) Dr. Lilly further found that she could make a fist bilaterally, extend her fingers, oppose her thumbs, and that she had mildly diminished sensation in her right hand and normal sensation elsewhere. After reviewing the evidence in the record, Dr. Knisely did not assess any manipulative limitations to Ms. Leger's physical RFC. Accordingly, ALJ Menard did not err by not including limitations arising from Ms. Leger's CTS in his RFC determination.

[7] As Plaintiff points out, SSR 96-9p provides that:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996). SSR 96-9p "does not mandate that the hand-held assistive device be prescribed to be considered medically necessary[.]" *Hoke v. Colvin*, 2015 WL 3901807, at *14 (N.D.N.Y. June 25, 2015). In determining whether the use of a cane is medically necessary, the ALJ "must always consider the particular facts of a case." *Clyburn v. Berryhill*, 2017 WL 6014452, at *3 (W.D.N.Y. Dec. 5, 2017) (internal quotation marks omitted) (citing SSR 96-9p, 1996 WL 374185, at *7). The plaintiff carries the "burden to establish medical necessity for the use of an assistive device[.]" *Gordon v. Colvin*, 2015 WL 4041729, at *3 (N.D.N.Y. July 1, 2015). Plaintiff has satisfied this burden by proffering evidence that a cane was prescribed to Ms. Leger, she used it, and through Dr. Lilly's finding that "[m]otor wise, there may be some generalized muscle weakness due to her condition necessitating the use of a cane[.]" AR 1182-83; *see also Clyburn*, 2017 WL 6014452, at *3 (finding that the opinion of a physician that the plaintiff's cane was "necessary" "satisfies the requirements of S.S.R. 96-9p because it (1) establishes that a cane is necessary to aid in walking or standing and (2) indicates that the cane is needed to minimize pain.").

to follow "prescribed treatment without a good reason[]" precludes a finding of disability under the regulations. 20 C.F.R. §§ 404.1530(b), 416.930(b). "[N]on-compliance with prescribed medical treatment *can* be a basis for denial of benefits if the claimant is disabled solely because he or she fails to follow prescribed treatment." *Smith v. Astrue*, 2011 WL 6739509, at *4 (N.D.N.Y. Nov. 4, 2011) (emphasis supplied), *report and recommendation adopted*, 2011 WL 6739596 (N.D.N.Y. Dec. 22, 2011). This rule, however, applies only if:

> [T]he Commissioner has first determined that the claimant is disabled and only when the Commissioner finds that the claimant's disability would be remediated but for the claimant's unjustified non-compliance with treatment. In other words, a claimant may only be denied disability benefits if the Secretary finds that she unjustifiably failed to follow prescribed treatment and that if she had followed the treatment, she would not be disabled under the Act.

*Id.* (internal quotation marks omitted).

In noting Ms. Leger's refusal to engage in physical therapy, ALJ Menard did not first find Ms. Leger disabled. Rather, he only noted Ms. Leger's failure to engage in physical therapy to "suggest[] [her] condition is not of disabling severity[,]" contrary to Ms. Leger's reported symptoms. (AR 27.) Although Ms. Leger's failure to follow her physicians' recommendations is relevant to her RFC, this fact did not render the ALJ's errors in determining Ms. Leger's RFC harmless. *See McIntyre*, 758 F.3d at 148 (noting that courts "apply harmless error analysis" to challenges of an ALJ's decision).[8]

---

[8] Courts of Appeals have applied two distinct tests when determining whether an ALJ's error is harmless in an SSA case. *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (stating the "general principle that an ALJ's error is harmless where it is 'inconsequential to the ultimate nondisability determination.'") (quoting *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008)); *see also Carmickle*, 533 F.3d at 1168 (Graber, J., dissenting) (noting that "[a]n ALJ's error is harmless if, in light of the record-supported reasons supporting the adverse credibility finding, we can conclude that the ALJ's error did not 'affect[ ] the ALJ's conclusion.'") (quoting *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1197 (9th Cir. 2004)). "The Second Circuit has not squarely addressed which, if any, of these harmless error tests it would apply in the context[.]" *Cheeseman v. Berryhill*, 2018 WL 1033226, at *12 (D. Vt. Feb. 23, 2018). In this case, regardless of the standard for harmless error, it is not satisfied here.

### E. Whether the ALJ Should Consider Ms. Leger's Death Certificate on Remand.

Plaintiff argues that the court should remand the case so that the Commissioner can consider Ms. Leger's death certificate, which issued less than a month after ALJ Menard's August 17, 2016 decision and listed Ms. Leger's cause of death as respiratory failure over a two-day period due to liver failure, cirrhosis, and alcoholism. The Commissioner responds that the death certificate does not meet the requirements for new evidence supporting a remand.

The court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" 42 U.S.C. § 405(g). In applying this regulation, the Second Circuit has developed a three-part test, allowing supplementation of the record when evidence is:

> (1) new and not merely cumulative of what is already in the record[] . . . and . . . is (2) material, that is, both relevant to the [plaintiff's] condition during the time period for which benefits were denied and probative[.] . . . Finally, [the plaintiff] must show (3) good cause for her failure to present the evidence earlier.

*Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991) (internal quotation marks and citations omitted).

On remand, the ALJ should consider Ms. Leger's death certificate in the context of the alleged severity of her liver condition, the consistency of her reported symptoms, and the likelihood of absenteeism from work. The parties do not dispute that Ms. Leger's death certificate is new evidence and not merely cumulative of the evidence already in the record. In terms of materiality, Plaintiff contends that the causes of Ms. Leger's death demonstrate that her liver failure was "much more severe than was indicated in some of the medical reports and in the ALJ's decision[]" (Doc. 10-1 at 23) as she passed away less than a month after ALJ Menard's determination that she was not disabled. Material evidence is both relevant to and probative of the plaintiff's condition during the time period for which benefits were denied and "requires . . . a reasonable possibility that the

25

new evidence would have influenced the Secretary to decide [the] claimant's application differently." *Lisa v. Sec'y of Dep't of Health & Human Servs. of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991). That standard is met here.

The Commissioner is correct that the death certificate, by itself, does not show that the liver failure, cirrhosis, and alcoholism were disabling at the time of ALJ Menard's decision. *See Harris ex rel. Harris v. Colvin*, 2016 WL 5340662, at *7 (E.D. Cal. Sept. 23, 2016) (denying the plaintiff's motion for a remand to consider the claimant's death certificate because "the new evidence still does not show that [the claimant] suffered any functional limitations from the onset date until the date of the ALJ's decision[.]"). The death certificate, however, supports a conclusion that Ms. Leger's liver condition was not improving, contrary to ALJ Menard's finding and that ALJ Menard erroneously discounted the prognosis that Ms. Leger was unlikely to survive the year.[9] *See Pollard v. Halter*, 377 F.3d 183, 193-94 (2d Cir. 2004) ("Although the new evidence consists of documents generated after the ALJ rendered his decision, . . . the evidence directly supports many of [the plaintiff's] earlier contentions regarding [her son's] condition[] . . . and strongly suggests that, during the relevant time period, [the] condition was far more serious than previously thought[.]"). Ms. Leger's death certificate is thus material to several findings critical to ALJ Menard's ultimate determination that she was not disabled.

Finally, Plaintiff must demonstrate "good cause" for her failure to present the evidence earlier. "'Good cause' for failing to present evidence in a prior proceeding exists where . . . the evidence surfaces after the [Commissioner's] final decision and the claimant could not have obtained the evidence during the pendency of that proceeding." *Lisa*, 940 F.2d at 44. The Commissioner argues that Ms. Leger died on September 11, 2016 and her counsel wrote to the Appeals Council on September 20, 2016 requesting review of the ALJ's decision without mentioning her death. On October 19, 2016, the

---

[9] ALJ Menard noted that her liver disease "did not result in her death. Indeed, once she quit abusing alcohol and engaged in consistent medical treatment, the evidence reflects her symptoms improved." (AR 25.)

Appeals Council granted Plaintiff's request for extension of time, advising him that he could submit new evidence, and did not issue its decision until December 1, 2016. In response, Plaintiff's counsel represents that he did not become aware of Ms. Leger's death until after December 1, 2016. Despite counsel's failure to communicate with his clients, the court finds that "good cause" warrants consideration of Ms. Leger's death certificate on remand.

### F.  Whether Ms. Leger's Alcoholism was a Material Contributing Factor to her Disability.

The Commissioner argues that, even assuming that Ms. Leger's liver condition was a disabling impairment, she would not be entitled to benefits because the death certificate does not make clear whether her alcoholism was a contributing factor material to her disability. *See* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J) ("An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."). If the Commissioner finds that a plaintiff is disabled and has "medical evidence of [a plaintiff's] drug addiction or alcoholism, [the Commissioner] must determine whether [her] drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(a), 416.935.

Although the record demonstrates that Ms. Leger continued to drink contrary to medical advice, ALJ Menard did not find that she was disabled. He therefore did not address the issue of whether her alcoholism was a material contributing factor to her claim for disability. The court cannot make this determination in the first instance and remands the issue to the ALJ for his or her determination. *See Quinones ex rel. Quinones v. Chater*, 117 F.3d 29, 36 (2d Cir. 1997) ("As the ALJ did not address this evidence, we think it best to remand the case so that he can consider in the first instance what weight to accord it.").

## CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiff's motion to reverse (Doc. 10), DENIES the Commissioner's motion to affirm (Doc. 11), and REMANDS the case for proceedings consistent with this Opinion and Order.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 29th day of March, 2018.

Christina Reiss, District Judge
United States District Court